[Cite as *In re A.R.M.*, 2022-Ohio-4551.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

IN RE: A.R.M.

:
:
:     Appellate Case No. 29458
:
:     Trial Court Case No. G-2013-002824-
:     2A
:
:     (Appeal from Common Pleas
:     Court – Juvenile Division)
:

. . . . . . . . . . .

O P I N I O N

Rendered on the 16th day of December, 2022.

. . . . . . . . . . .

KEVIN D. HUGHES, Atty. Reg. No. 0065620, 20 South Main Street, Springboro, Ohio 45066
    Attorney for Plaintiff-Appellee

JULIA C. KOLBER, Atty. Reg. No. 0078855, 77 West Elmwood Drive, Suite 304, Dayton, Ohio 45459
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** Mother appeals from an order finding her in contempt for violating the trial court's order for parenting time. According to Mother, the court abused its discretion by finding her in contempt because Father did exercise his parenting time with the parties' minor child, A.R.M. ("A.M."), on January 15, 2020. For the reasons discussed below, we conclude that the court's contempt order was supported by sound reasoning and was not an abuse of discretion. Accordingly, the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

**{¶ 2}** This is the second time this case has been before us, and it is based on a similar issue, i.e., that Mother was "unilaterally scheduling musical performances for A.M. and taking the child to those performances during Father's parenting time." *In re A.M.*, 2d Dist. Montgomery No. 29042, 2021-Ohio-3691, ¶ 8.

**{¶ 3}** Our prior decision noted the following facts:

Mother and Father are the parents of A.M., who was born in March 2012. A.M. is a special-needs child who was born legally blind. He reads braille and walks with a cane. A.M. possesses extraordinary musical talents. He is a piano prodigy who has performed on nationally-recognized television programs and has made numerous other public appearances. Prior to the child's first birthday, Father moved to establish parental rights and sought parenting time. The parties subsequently resolved all custody and parenting-time issues through an "Agreed Order of Parental Rights and

Responsibilities." The trial court accepted the agreement and journalized it on June 18, 2014. As relevant here, the agreement designated Mother as A.M.'s residential parent and legal custodian, while designating Father as the child's non-residential parent and awarding him standard parenting time. With regard to "other parenting time," the parties agreed to attempt to accommodate reasonable requests from one another. The agreement provided for make-up parenting time if an emergency prevented scheduled parenting time. The agreement also precluded both parents from interfering with reasonable telephone or other communication with the child. Finally, under the heading "Welfare of the Child," the agreement provided: "The parties recognize that the welfare and happiness of their child is of paramount importance and that their respective rights relating to their child and the companionship of the child shall be exercised in such a manner as to promote the welfare of the child with due regard to the equal rights and interests of the other parent and the child."

*Id.* at ¶ 3.

{¶ 4} After the original agreement was made in 2014, many motions were filed. The first series of motions were resolved by an agreed order filed on March 1, 2016. Among other things, "[t]he agreement again provided for make-up parenting time in the event of an emergency, and it required each parent to allow reasonable telephone or other communication with the child." *Id*. at ¶ 4. "With regard to the 'Welfare of the Child' provision, the agreement added the following language: 'Both parents will share the

decision making rights, the responsibilities and the authority relating to the health, education and welfare of the child.' " *Id.*

{¶ 5} More motions were filed in 2018 and 2019, including motions to modify parenting time, Father's motions for contempt for Mother's interference with his parenting time, and Mother's motion "to limit Father's involvement in A.M.'s musical performances and to have flexibility to schedule performances during Father's parenting time provided that he received make-up time." *Id.* at ¶ 7.

{¶ 6} After hearing testimony over four days, the magistrate made the following decision on July 18, 2019:

* * * The magistrate sustained Father's motion for parenting time in excess of the standard order and provided a schedule and guidelines to follow. With regard to the child's musical performances, the magistrate ordered that the parent whose parenting time is impacted by such performances must agree to them being scheduled. The magistrate further ordered that whichever parent is exercising parenting time during a scheduled performance is responsible for transporting the child to the performance and is "in charge" of the child at the performance unless both parties agree otherwise. With regard to contempt issues, the magistrate overruled multiple contempt motions filed by both parties. The magistrate did sustain two of Father's contempt motions, however, based on Mother unilaterally scheduling musical performances for A.M. and taking the child to those performances during Father's parenting time.

*Id.* at ¶ 8.

{¶ 7} After Mother filed objections, the trial court overruled her objections on January 25, 2021. We noted that:

> * * * As relevant here, the trial court's January 25, 2021 ruling sustained Father's motion for modification of his parenting time. The trial court granted him increased parenting time beyond the standard order as detailed in its ruling. The trial court also sustained Father's two contempt motions involving Mother's scheduling musical performances for A.M. during Father's parenting time without his consent. The trial court found Mother in civil contempt and imposed purge conditions that required her to follow parenting-time orders for 12 months.

*Id.* at ¶ 9. Mother appealed from the trial court's decision, and we affirmed the decision on October 15, 2021.

{¶ 8} In the meantime, Father filed another motion for contempt on February 7, 2020, alleging that Mother had interfered with his parenting time on January 15, 2020, by scheduling A.M. for a musical performance in California without Father's consent. That motion and other pending motions were ultimately heard by a magistrate on July 7, 2021.

{¶ 9} On July 23, 2021, the magistrate filed a decision finding Mother in contempt of a parenting time order the court had put in place on March 12, 2019, because she had scheduled a performance for A.M. during Father's parenting time without Father's agreement. The magistrate found the contempt was willful and ordered that Mother serve two days in jail, pay $350 in attorney fees, and pay $80 in court costs. The jail

time was suspended on the condition that Mother follow the controlling parenting order and pay the attorney fees and court costs within 12 months.

{¶ 10} Mother filed objections to the magistrate's decision on August 5, 2021, and a further memorandum in support of her objections on February 7, 2022 (after the hearing transcript was filed). Father responded to the objections on March 17, 2022. The trial court then issued a decision on March 29, 2022, overruling Mother's objections and adopting the magistrate's decision, including the imposed sentence, court costs, and attorney fees. Mother timely appealed from the court's decision.

## II. Alleged Abuse of Discretion

{¶ 11} Mother's sole assignment of error states that:

> The Trial Court Abused Its Discretion and Erred in Finding Mother in Contempt of a Court Order.

{¶ 12} Under this assignment of error, Mother contends that the trial court abused its discretion by finding her in contempt for failing to allow Father parenting time with A.M. from 5:00 p.m. to 8:00 p.m. on January 15, 2020. According to Mother, Father exercised his parenting time on that day because he was made aware of the Little Big Shots show in which A.M. performed and also attended the show. Mother further argues that A.M. had not been under her control or supervision at that time but had been under the studio's control. In addition, Mother contends that under paragraph 17 of the standard parenting order, performance in the show was an "extra-curricular" activity in which A.M.'s participation should not be interrupted.

{¶ 13} Before addressing these points, we will outline the standards that apply to contempt findings.

A. Contempt Standards

{¶ 14} "Contempt is defined in general terms as disobedience of a court order." *State ex rel. Corn v. Russo*, 90 Ohio St.3d 551, 554, 740 N.E.2d 265 (2001). "The power of contempt is inherent in a court, such power being necessary to the exercise of judicial functions." *Denovchek v. Bd. of Trumbull Cty. Commrs.*, 36 Ohio St.3d 14, 15, 520 N.E.2d 1362 (1988). "A common pleas court has both inherent and statutory power to punish contempts * * *." *Burt v. Dodge*, 65 Ohio St.3d 34, 35, 599 N.E.2d 693 (1992), citing *Zakany v. Zakany*, 9 Ohio St.3d 192, 459 N.E.2d 870 (1984), syllabus. "Civil contempt sanctions are designed for remedial or coercive purposes and are often employed to compel obedience to a court order. * * * Thus, civil contempts are characterized as violations against the party for whose benefit the order was made." (Citation omitted.) *Corn* at 554-555.

{¶ 15} "A prima facie case of contempt is made by establishing a prior court order and a violation of its terms," and contempt findings "must be supported by clear and convincing evidence." (Citations omitted.) *Martin v. Martin*, 179 Ohio App.3d 805, 2008-Ohio-6336, 903 N.E.2d 1243, ¶ 24 (2d Dist.). After the moving party proves a violation, the nonmovant bears the burden of establishing a defense for noncompliance. *Id.*

{¶ 16} We review contempt orders for abuse of discretion. *State ex rel. Cincinnati*

*Enquirer v. Hunter*, 138 Ohio St.3d 51, 2013-Ohio-5614, 3 N.E.3d 179, ¶ 21. An abuse of discretion " 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). "[M]ost instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.* This standard of review is "highly deferential," and "we will not lightly substitute our interpretation for that of the issuing court." (Citations omitted.) *Hunter* at ¶ 29.

## B. Discussion

{¶ 17} After reviewing the record, we find no abuse of discretion by the trial court. As a preliminary point, we stress that the trial judge has dealt with these parties on many issues since 2014, and has had ample opportunities to assess their actions and credibility. Notably, trial courts resolve witness credibility and the weight to be accorded to the testimony. *Jenkins v. Jenkins*, 2012-Ohio-4182, 975 N.E.2d 1060, ¶ 18 (2d Dist.). " 'The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony' " *Davis v. Flickinger*, 77 Ohio St.3d 415, 418-419,

674 N.E.2d 1159 (1997), quoting *Seasons Coal Co. v. City of Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶ 18} At the time of the alleged contempt, the trial court's standard order granted Father parenting time on Wednesday evenings from 6:00 p.m. to 9:00 p.m. As Mother notes, the parties had agreed that Father would instead exercise time on Wednesdays from 5:00 p.m. to 8:00 p.m. For the week of January 12, 2020, Father's parenting time, therefore, would have been scheduled for Wednesday, January 15, 2020, between 5:00 p.m. and 8:00 p.m.

{¶ 19} According to the record, Mother told Father about the January 15, 2020 Little Big Shots performance via Our Family Wizard ("OFW"), which the parties used for communication. Transcript of Proceedings ("Tr.") (July 7, 2021), p. 16. Mother gave this notice late in the evening (at 10:36 p.m.) on January 8, 2020, less than 12 hours before Mother and A.M. flew to California (on January 9, 2020). *Id.* at p. 26, 68, and 116-117, and Defendant's Ex. B.

{¶ 20} Mother contends that there is no evidence that she "knew about the show any earlier than she provided the information to Father." Appellant's Brief, p. 6. This assertion is not credible. Mother testified that A.M. was under contract to perform on January 15, 2020, that there was "a lot of paperwork," and that she "signed employment documentations." Tr. at p. 111. Mother also testified concerning a November 5, 2020 appointment to obtain a medical waiver that she needed for A.M.'s employment. She stated that to obtain the waiver, A.M. had to have a physical. *Id.* at p. 70-71. Mother did not notify Father about this medical appointment. *Id.* at p. 16. Clearly, Mother knew

about the show well before January 8, 2020, but chose to conceal it from Father until the last minute on the evening before she and A.M. left for California.

{¶ 21} Mother's message to Father on January 8, 2020, stated, among other things, that:

> [A.M.] is going to be performing on Jan 15 for the first time in front of a studio audience in L.A. When is a good time to accommodate makeup parenting time so [A.M.] can take advantage of this incredible opportunity?
>
> If you want to attend the taping of the show on the 15th, you should fly into LAX.

Plaintiff's Ex. 2, p. 2.

{¶ 22} In response, Father stated, on January 9, 2020, that:

> I am not okay with [A.M.] missing school and I am not okay with my parenting time being affected. This is the same problem we had before. You schedule things over my time without even asking me if I'm okay with it. Right now I have no option but to reschedule.
>
> What show is he performing on? Who do I get in contact with to provide my information?

*Id.*

{¶ 23} Father testified that he asked Mother multiple times for the name of the show on which A.M. was to appear, but she refused to tell him. Instead, A.M.'s school principal had to tell him. Tr. at p. 44. In response to Father's request on January 10, 2020, for the name of the show, Mother sent Father a message the same day, stating:

Somehow you found out the show, Little Big Shots, without me ever disclosing the name of the show to you. How did you find out?

Could you imagine if all the guests of the show felt they deserve to speak to someone on the show?

Ex. 2 at p. 1.

{¶ 24} Although Father had less than a week to obtain airline tickets and lodging, he flew to California to see A.M. perform. Tr. at p. 143. He notified Mother on Sunday, January 12, 2020, that he would be in California on Tuesday, January 14, 2020, and that he would be staying in Burbank. *See* Plaintiff's Ex. 19, p. 1. Father also sent Mother a message at 7:30 a.m. on January 15, 2020, asking, "What does the schedule look like for today? When can I see [A.M.]?" *Id.* Mother did not respond until mid-afternoon and then said only that, "We don't get a schedule." *Id.* *See also* Tr. at p. 140-141. She did not offer at any point to let Father see A.M.

{¶ 25} A.M. performed around 8:00 p.m., California time, and the show ended around 9:00 p.m. Tr. at p. 46 and 142. Father sent Mother a message on OFW at around 9:06 p.m., stating that he would really like to see A.M., and asking if they could meet somewhere. *Id.* at p. 142; *see also* Ex. 19 at p. 1. Father also called Mother's phone and got no response. He continued to call throughout the night, and finally got a call from A.M. at around 10:30 or 11:00 p.m. At that time, it was clear that A.M. had no idea Father was in California or that he had seen the show, as A.M. stated, "Guess where I'm at? * * * I'm in California." Tr. at p. 143. When Father said he was in California, too, A.M. asked if he could come to see Father, but Mother refused. *Id.* at p. 143-144. As

to her reasons for refusing, Mother testified that it had been a "long day," and A.M. was worn out and ready for bed. *Id.* at p. 65.

{¶ 26} The magistrate found, based on witness credibility and demeanor and the evidence presented, that Mother was in willful contempt of the March 12, 2019 parenting time order. Magistrate's Decision and Judge's Order (July 23, 2020), p. 2. After reviewing the record, the trial court also found that none of Mother's explanations for her "contemptuous behavior" were compelling. Judge's Final Appealable Order (Mar. 22, 2021) ("Decision"), p. 3. We agree.

{¶ 27} First, the court rejected as false Mother's claim that she did nothing to prevent Father from exercising his parenting time. *Id.* This is correct. In fact, Mother did everything she could to prevent Father from seeing A.M., including removing him from the state during Father's scheduled time, attempting to conceal the location of the performance, not timely responding to Father's attempts to see A.M., and not even telling A.M. that his father had flown to California to see the performance.

{¶ 28} The trial court further rejected Mother's claim that A.M. had been engaged in "continuous participation in an extracurricular event" under paragraph 17 of the order. In this regard, the court commented that A.M. had not been involved in an extracurricular event; instead, he "was working as a contracted employee of WB Studios and was, presumably, compensated for his time." *Id.* Again, we agree. Mother signed employment agreements and even had to obtain a medical examination to permit A.M.'s employment.

{¶ 29} In addition, the trial court was not persuaded by Mother's claim that she had

lacked control over A.M. the day of the show. We also find Mother's claim unpersuasive. Contrary to Mother's assertion, she removed A.M. from Ohio and agreed to his contractual employment at a time that she knew conflicted with Father's parenting time. *Id.* Mother's actions were deliberate, and her excuse that the studio controlled A.M. that day was not credible. Mother also testified that she "maybe" could have let Father come backstage but did not know. Tr. at p. 115. Clearly, Mother made no effort to even inquire.

**{¶ 30}** For the same reasons, Mother's other arguments are unpersuasive. The fact that Father flew to California and was able to watch his son perform at a distance (and without the child's knowledge) was not a substitute for the parenting time Father was denied. Mother's claim that Father's parenting time "had passed" because Father did not make specific efforts to obtain it during the hours of 5:00 p.m. and 8:00 p.m. "Pacific time" also lacks credibility. *See* Appellant's Brief at p. 8. The OFW record showed that Father asked at 7:36 a.m. (or 10:36 a.m. Pacific time) on January 15, 2020, as to when he could see A.M. Mother's only response was that there was no set schedule, and she completely failed to make any attempt that day to let Father see the child.

**{¶ 31}** Based on the preceding discussion, the trial court's decision was based on sound reasoning and was not an abuse of discretion. Accordingly, Mother's assignment of error is overruled.

## III. Conclusion

**{¶ 32}** Mother's sole assignment of error having been overruled, the judgment of

the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and LEWIS, J., concur.

Copies sent to:

Kevin D. Hughes
Julia C. Kolber
Hon. Anthony Capizzi